I'd like to start off by listing through some of the violations of Mrs. Westfall's constitutional rights that occurred on the night in question. I probably won't have time to get through all of them, but I think it's important to establish early on that this entire transaction begins with a violation of her constitutional rights. And throughout the entire interaction between Mrs. Westfall and the appellees, the appellees are trespassers on her property, which I think is something that's important contextually to the totality of the circumstances test that applies here. For context, this whole event starts when Mrs. Westfall's son, who is a 15-year-old boy, is having a few friends over for a sleepover to watch a Star Wars marathon. Late in the evening, or early in the morning, in the middle of the night, two of the boys go next door to the neighbor's house where Mrs. Westfall's best friend lives. Mrs. Westfall's son spends a lot of time over there because it's his best friend. But they go in the middle of the night and they enter through the garage door, which is unlocked, but they don't knock and wait for someone to let them in. And he's not even there. And the best friend is not there. Although the record shows that they have the son's permission to go in and retrieve something from his room. They go into the house. They encounter the sister. They knock on the sister's door. She opens the door to her room and says, you can't be here. You need to leave, at which point they immediately leave. And then the sister calls 911. And Officer Trevino responds to this call. So just contextually, there's an allegation of trespass in the middle of the night. But it is two teenage boys. They are not armed. No violence is committed. The trespass terminates of its own volition. As soon as the boys are told they don't have permission to be in the house, they leave. At this point, Officer Trevino calls Officer Anderson for backup. And they go next door to Mrs. Westfall's house and knock on her door. This is the first violation of her constitutional rights. The U.S. Supreme Court held in Florida v. Jardines that a middle-of-the-night knock-and-talk is presumptively unconstitutional. Does it say that in the majority opinion? Or did you take that from the dissenting opinion? I don't know that they use the word presumptively in the majority opinion. But they do talk about the limitations on the license to enter onto private property without either a warrant or exigent circumstances. And neither a warrant nor exigent circumstances have been alleged here. The license is an implied license based on what the person would expect. When police officers go onto private property without a warrant or exigent circumstances, they have no greater rights than a private citizen. A private citizen has an implied license to go onto your property, to approach the door, to go up to the front door, and knock on the door, and then wait to be received. And then they must leave unless they're invited to stay longer. So the appellees in this case first violate Mrs. Westfall's Fourth Amendment rights by going and knocking on her door in the middle of the night without invocation, without warrant, without exigent circumstances. Then when she comes to the door, she answers the door. You can tell that she's been asleep. She says she's been asleep. It's the middle of the night. She comes downstairs after several knocks and opens the door, and they explain to her why they're there. She says to them that the next-door neighbor is where her son's best friend lives. She then closes the door and retreats into her home. This is another thing that the Supreme Court recognized in Jardines, that a private citizen has a right to do, retreat into their homes and be free from unreasonable interference by the government. At that time, under – You're not – this is not another one on your list of violations. I'm trying to count them. You said you're going to list all the constitutional violations. And I am including not leaving when she terminates the conversation. You might just want to go through these, because I see the time is ticking, and we're pretty familiar with the facts. Wait a minute. Oh, sorry. Let me say one thing. If this case is a hard case and you're down, you allotted yourself only nine minutes, and that's because there's not much time here. So can we have a little more flexibility on our time? Certainly. Certainly. Each side can have ten more minutes to start. And if we need more time, then we'll have that. And if there are particular incidents that are closer to the line and that the court is more interested in, I'm happy to focus on those. And I'm happy to be guided by your questions. So we've done two of the nine. Is that right? Yes. The third violation occurs when, after she terminates the conversation, the officers go and walk around the cradles of her house, which is a violation of her Fourth Amendment rights under well-established law that's also listed in Jardines. They also enter into her backyard, which is a gated backyard, which is another violation of her Fourth Amendment rights. They shine flashlights into windows. Now, the police are permitted to look into a window from the street, even use binoculars from across the street to look into a window, but they're not permitted to go onto the cradles of the house without invitation or warrant or to look in the window from the cradles of the house like a peeping Tom might. So this is the third violation. After that, I'll skip ahead in the facts because you're familiar with the facts, but after Mrs. Westfall comes back out because she hears her son being interrogated by the police without the presence of a parent, she comes out and asks what's going on. The officer, Officer Luna, instructs, tells her that he will tell her what's going on, but only if she comes away from where her son is being interrogated. She declines. Not surprisingly, she wants to stay with her son, who she hears being threatened that they're going to take him to jail, but she still asks again what's going on. At this point, Officer Luna tells her to be quiet, and the next time she tries to ask a question, he tells her again to be quiet and threatens her that if she isn't quiet, he's going to make her go and wait inside, meanwhile they're interrogating her minor son outside without her or any parent. Okay. Is that ñ I was looking in the briefing for that. Is there an actual claim live now about the son being interrogated and all of that, or is that just a factual circumstance about her situation? I think the record demonstrates that it's a custodial interrogation outside the parents. One of the boys asks if they're free to leave, and they're told no, but she hasn't asserted a claim based solely on that. So there's not something about them, whether they're Mirandized, or if they should be in custody with their minors without their parents. There are no claims about that. Other than it is relevant as circumstances to the totality of the circumstances, there's not a specific claim for violation of the son's right being Mirandized. Or being interrogated and not allowed to leave and all of that. Yeah. Yeah, okay. Yes, Your Honor, that's correct. The district court mentions that ñ says that the fact that they keep telling her to be quiet and preventing her from speaking under threat of being forced to go back inside does not constitute a violation of her First Amendment right. Assuming that that is true ñ I'm not conceding that it is, but assuming that is true, this court has told in several cases that it is a violation of the First Amendment right when a citizen is arrested under one purported reasoning, but there is, in this case, fact questions under which the jury could reasonably conclude that the reason the person was arrested was not because they were committing any crime or reasonably believed to be committing any crime, but in fact because they had dared to ask questions of the police, to challenge the police in some way, and this was retaliation for that, something that's commonly referred to as contempt of cop. I would direct the court to Mesa v. Prejean and Enloe v. Tishomingo County. Enloe v. Tishomingo County is particularly relevant here, I think, because of the factual parallels. The next violation is the illegal search of her home. After one of the teenage boys who was being interrogated admits that he has a little bit of marijuana and it is upstairs in the Westfalls' home, Dr. Luna says to Mrs. Westfall that they can do one of two things at this point. I think it's one of two ways they can handle it. One, they can keep them outside forever while they get a search warrant. I don't believe there's any legal authority for them to keep them outside while they get their search warrant, especially in January in the middle of the night. The son is wearing shorts and a T-shirt and a shoe, and Mrs. Westfall is in her nightgown. Or two, the other option is someone can go in and get it and bring it out. Mrs. Westfall instructs her son to go in and get it and bring it out. At the same time that this is happening, Mr. Westfall comes out. Officer Anderson, who has announced earlier that he won't be speaking to Mrs. Westfall because she closed the door in his face earlier, Mr. Westfall comes out, addresses him, says, Sir, do you live here? And Mr. Westfall says, Yes, he lives there. And Officer Anderson says, Look, at this point what's going on is we know there are drugs in the house. We need to go in and retrieve them. You can pick whichever boy you want to go in with us, and I want you with me. And at that time, Mr. Westfall does not respond. He doesn't say anything, but he is obedient. He does go with them as the son, who Connie has instructed to go inside, goes in. Officer Anderson, who has said he's going in, goes in, and Mr. Westfall follows. At this time, Mrs. Westfall moves to follow them into the house, and Officer Anderson turns to her and says, You're not going anywhere. You slammed the door in our face earlier. Mrs. Westfall insists that she has the right to go in the house if she wants to, at which point Officer Anderson says, You're not going to step up on me. You're not going to step up on me after we gave you specific instructions. What number are we on? Are we on a five or six? The illegal search is five. Prohibiting her from entering our home, which she has a constitutional right to do under Zardines, is six. And then we're about to get to seven, which is the assault. But as far as consent goes, there are two bases on which the appellees allege that they have consent. First, they allege that Mrs. Westfall gave them consent by instructing her son, Will, to go into the house and get the drugs. She said, Go in and get it, I believe is the language. I don't agree that you could reasonably construe instructions to someone who lives in the house to go into the house and retrieve something to be permission for the police to go into your house and search it. But even if that were the case— It's sort of unlikely that once they understand that there are illegal drugs in the house, that they're going to allow the son to go without a police officer because the next thing that could happen is it would be flushed down the toilet or whatever. So at that point, I think possibly anyway, and I don't mean to create a problem for you, but I do think that a police officer would think, I need to go with him. I need to make sure that nothing happens to these drugs because they're—I mean, that's an argument. Yes, Your Honor. The two things I would say in response to that is, one, it was initially one of the officers suggested that someone should go in and get it. So I think it's reasonable in that context to assume that someone's going to go in and get it. But even if there's a reasonable basis— You mean someone, i.e., a police officer. Is that who you're talking about? Yes, one of the officers. Okay, one of the officers. Dr. Luna. Right. There's one of two ways we can handle this. No, but I thought you meant that not a police officer to get it. I thought you meant one of the children were going to go get it. Yes. Yeah, but— You go ahead and ask it. Maybe you can ask it better. No, I guess all three of us are trying to clear this up. But I want to be sure you're not agreeing to something you don't mean to agree to. I think what you said is that the police officer suggested that somebody could go in and get it, right? Isn't that what you're saying? Yes. I don't want to put words in your mouth. Yes, Your Honor. All right. I understood that instruction. And I think what Judge King is saying, though, that was not to say if an officer suggested that someone go in and get it, that's not the same as saying, and I'm not going to go in with you. Right. Right? Yes, Your Honor. All right. I understood the instruction in the context to mean that one of the kids would go get it. But even if you argue that a reasonable officer would think that it was permission, consent to search— That he should go with him. Even if you construe this as consent to search, the U.S. Supreme Court has held that consent to— I'm not sure it's consent to search. I mean, maybe, you know, the word search is very broad. But what I'm saying is it maybe could be construed by a police officer to be consent to go and get the drugs. You know, not search. Go get the drugs. Okay. And even if we assume that it was reasonably—would reasonably be construed to be consent to enter the house, there's no question that that consent was withdrawn. The U.S. was withdrawn at the time they entered the house. We'll talk about those facts in the assault. But it was revoked shortly thereafter, once it became clear that the officers were going to enter the home with the child, that the mother would not be permitted to go in. Yes, Your Honor. Before it was undertaken, or right at the instigation of it, your position is that consent was clearly but revoked. Yes, Your Honor. No reasonable officer thought they had permission to go into that house without her— Well, do you have to say no reasonable officer thought, or do you just have to create a fact issue as to whether a reasonable officer could? So are you trying to get judgment as a matter of law here, or what is your— Under her version of the facts, under the appellant's version of the facts, which we have to treat as true in this context, under that version of the facts, no lawful officer could have thought that he had permission for Mrs. Westphal to go in that house at that time without her. Because she specifically revoked any permission that had been implied earlier. She didn't say the words, I revoked any permission. I don't think she believed she gave consent. But I think it was— She cleared it up. The circumstances were such that nobody thought that they had consent. And Officer Anderson, who was the one who went into the house, later says something to the effect of, your mom didn't even want us in this house. So it's at least clear that he understood that she didn't want him in the house without her. I see that I am running low on time, so I will move forward. I'd like to talk a little bit about the assault at this time. Mrs. Westphal—what occurs on the record is that Mrs. Westphal moves to follow her son and her child and Officer Anderson into the house, at which time Officer Anderson turns and says, you're not going anywhere, you slam the door in our face. Mrs. Westphal insists that she can go in her house. She continues to move towards the door to go in the house. Officer Anderson says, you're not going to step up on me after we gave you specific instructions. From the court, from this statement, you're not going to step up on me after we gave you specific instructions. The district court construes that as evidence that—in fact, irrefutable evidence, and Mrs. Westphal's evidence has to be completely disregarded— as evidence that Mrs. Westphal was a threat to the safety of Officer Anderson. There are two things I'd like to say in response to that. One, I think it is—I think each side needs to give five more minutes. Yeah, absolutely. Each side gets it, and so everybody's getting a fair shake here today. Go ahead. Two things I'd like to say about the inference that Officer Anderson felt that his— the inference that Officer Anderson may have felt that his safety was at stake. One, I don't—I think that at this stage in the proceedings, we have to draw all inferences in favor of the appellant, Mrs. Westphal, and not the officers. Another inference you could take from Officer Anderson's statement, you're not going to step up on me after we gave you specific instructions, is not that he feels that he is in danger, but that he is angered that she is not obeying their command to stay outside. So I think if you take the inferences in favor of Mrs. Westphal instead of in favor of appellees, as the law requires us to do, that record does not disprove her evidence. And she put forward evidence that she was not moving aggressively or in any way threatening Officer Anderson. She was just trying to enter the house. Additionally, even if you draw the inference from Officer Anderson's statement that he did, in fact, feel threatened, that he felt a threat to his safety, the jury could still conclude that even though he subjectively felt that, it was not objectively reasonable for him to feel that, given the circumstances. There's no weapons. Mrs. Westphal has not made any threats. There's no reason to believe that there's violence on the table at this point. The jury could conclude, could credit Mrs. Westphal's evidence, she put forward evidence that she wasn't threatening him or moving aggressively towards him, and conclude that that statement, even if it did reflect a belief that he was in danger, was not objectively reasonable. But could they also say, she might not have thought, but an officer could because they have experience with parents when their children are at risk or whatever, and they get into the situation such that they might pose a threat when they otherwise would not. I think if you accept Mrs. Westphal's evidence on the case, if they credit Mrs. Westphal's testimony, then they can't believe it's reasonable because Mrs. Westphal's testimony is going to be all I was trying to do was enter the house. I did not move in any aggressive way. But it has to be his perception, or the officer's perception. But his perception has to be objectively reasonable, and I think if you credit Mrs. Westphal's facts, a perception that he is in danger of some sort is not objectively reasonable. Now, if you don't credit her facts, that's a different question, but I think at this stage we're required to. Right. I'm just saying that you could credit her facts, and it would be all about her motives and what she was doing, but that an officer could perceive them as threatening moves even if they're not at all intended in that way. Well, her testimony would not just be about her internal intentions, but also about physically what she did. What she actually did. Yes. And you're saying that a person would not perceive those things, a reasonable officer as being in any way threatening. And to be clear, was she at this point saying that you're not, I don't want you to go into my house, or was she saying you're not going in without me going in as well? What she's saying is I can go in. All right. That's what she's saying at that point. There's never expressed consent for them to go in, and there's never expressed withdrawal of that consent. In both cases, it would have to be inferred from the circumstances. I'd also like to, before we move on from consent, I'd like to point out that there's a heightened standard of consent that applies when there's been a prior violation of a Fourth Amendment right, as I believe in this case there has been several. Under that standard, you have to prove that the consent, ordinary consent won't do. You have to prove that consent is an act of free will that breaks the causal chain between the prior violations and the consent. And I don't think that heightened standard is met here with respect to her telling her son to go in and get the marijuana. And we have two cases that say that. I think one that Judge Smith wrote for the court. I don't know who the author is. I'm just trying to. You're getting that from our cases? Yes, Your Honor. I'll give you a case name, actually. Okay. It doesn't matter. I'm just trying to make sure. You go ahead. If you do ask Justice Hernandez, it's the case where you talk about the heightened standard for consent after multiple violations of the Fourth Amendment. And we didn't talk yet about whether or not Mr. Westphal's compliance with the officer was consistent, but this court has also held that silence or mere passivity cannot constitute consent under the Fourth Amendment. And that case is Gates v. Texas Department of Protective and Regulatory Services. Do you have two more? Or is that it? You've got a fault. You're nine. The last two are false arrest and denial of medical care. For false arrest, I think there's a fact question on this record of whether or not the officers arrested her because she was interfering. I want to back up for a second. You've got 58 seconds. Who was involved in the assault? Which officers? The officer that you claim was involved in the assault. Specifically, Officer Luna is the one who throws her to the ground and is initially on her, and then Officer Trevino comes and joins him in pinning her to the ground. And also, I'd like to point out that... And so your claim is that the pinning her to the ground was also an assault, not just the getting her to the ground, which was Officer Luna, but then what Officer Trevino did also was an assault. Yes, the excessive force in both cases. Well, as I understand it now, he just put his weight on her to keep her down. Is that right? With his body on top of her. Luna does it. Officer Luna, yes. Right. I'm talking about Trevino. My understanding is she comes and adds her body weight to help pin him down. All right. All right. And that's what you're calling her assault. Yes, although I shouldn't use the term assault. I should use excessive force. That wasn't justified because Mrs. Westphal, to the extent she was struggling at all, she was struggling to cover herself because as she had gone to the ground, her nightgown had come up and she was exposed to the other people on the porch, including some teenage boys, and was trying to cover herself. That's why she's struggling. I have run out of time, so I will pass the mic to Mrs. Westphal, who is here, representing herself in the interlocutory appeal that started before the judgment was entered and before this appeal began. May it please the Court. My name is Constance Westphal. I am the appellant, and I'll be addressing a piece of this appeal related to appellees' claim of confidentiality. Throughout the course of this litigation, appellees have tried to obtain my agreement to keep appellees' non-confidential information confidential. To do this, appellees have leveraged access to their evidence, and appellees have leveraged protection of my confidential information and third parties' confidential information, confidential information that should have been protected as a matter of course. In bringing this lawsuit, I'm doing what I can to make sure that what happened to me does not happen to anyone else. Because if it happened to me, it can happen to anyone. And that can't be done if this lawsuit is shrouded in the secrecy that appellees want. Just a second. Two, three, six minutes, right? Or, okay. It's showing 20. I'm not trying to, I appreciate your argument very much, but I don't want to give, yeah. So, go ahead. Please continue. Please continue. It was six minutes was what she was supposed to have. Okay. Appellees claim this appeal is moot because they waived the privilege to make the internal affairs report available to be in the public. Appellees withheld the internal affairs report from me and the public because the report was confidential under an absolute state law privilege citing Texas local government code section 143.089G. The internal affairs report was attached to appellees' motion for summary judgment, a dispositive motion, so it was a judicial document to which publics presumptively had a right to access under common law and the First Amendment. So, appellees' insistence on secrecy is inconsistent with the public's right to know. The public's right to know what is going on with their police. Can you help us? Because that document has subsequently become available. How does that affect your claim, if at all? Isn't it an argument that you're correct that it should not have been under seal to begin with? Right. Assuming argument that you're correct. Just take that. The fact that it's now not under seal, what is it that you're seeking on this? Okay, well, let me... Okay. You'll explain that. An appellee's insistence on secrecy is inconsistent with the public's right to know what is going on in their courts. And, in fact, the document isn't privileged. There's no legal support for a claim of absolute state law privilege. The state cannot unilaterally limit the availability of evidence in a federal civil rights case. Federal law, not state law, applies. And this court in Coughlin v. Lee held that the federal law does not allow blanket law enforcement privileges. There is a qualified privilege for an ongoing criminal investigation and material identifying confidential sources, neither of which is at issue here. Yet, on an appellee's motion, the court sealed the internal affairs reports for me and the public. Appellees knew I needed the internal affairs report to meet my deadline. Appellees conditioned access to their evidence on my signing a nondisclosure agreement. This violates, as summarized by courts in this circuit, the plaintiff's venerable right to every man's evidence under the Federal Rules of Civil Procedure. And it wasn't just the internal affairs report. Appellees claim that all 6,300 pages of responsive documents are privileged and would only be made available to me if I signed a nondisclosure agreement. Similarly, appellees would only agree to protect my confidential information, medical, financial, employment, information that is routinely found as a good cause for protection, but only if I would agree to treat all of their information as confidential. Since there was no basis to do so, I could not agree. So I filed a motion for protective order to protect my personal sensitive information. Appellees in response to my motion offered up a totally inapplicable mechanism, a trade secret protective order. Appellees made no particularized showing of good cause for a trade secret protective order. Appellees did not even file a motion for protective order. Yet the district court entered a trade secret protective order in this civil rights case. The practical effect is identical to the sealing order. Appellees' information is given confidential treatment even though it is not confidential under federal law. This is because in addition to protecting trade secrets, the order protects, quote, other information required by law to be kept confidential, unquote. So appellees are using the state law privilege to claim a blanket privilege over all of their documents. So appellees have made an in-run around this court's decision in Coughlin, which rejected a blanket law enforcement privilege. The order also allows appellees to seal non-confidential documents from the public. And I, the plaintiff in the civil rights case, do not have access to appellees' evidence because I'm not allowed to see the evidence. And the evidence that I do have now I must destroy within 60 days of exhaustion of all appeals, even though there's no colorable claim of confidentiality for these documents in this matter of public concern. So you're seeking relief from the order that you had to sign to get access. Is that what you're seeking? No. I never signed a non-disclosure agreement. Okay. So you're not seeking any. So why do you have to destroy it within 60 days? Because the judge entered a trade secret protective order. So pursuant to this order, so you were seeking reversal of this order. Vacating. Yes. You want us to vacate this order. Yes. But it's still in effect. It affects your current rights. Yes. Because it makes you destroy documents within 60 days that you believe are not actually confidential. Yes. And there's another point that my confidential information, which is routinely protected, is not protected. And because I would not agree to appellees' non-confidential government information being confidential, appellees have made publicly available my confidential information, the confidential information of third-party juveniles, and the confidential information on my family. So where is that? In this court. In this court, appellees for no legitimate reason attached depositions of me and my husband to a procedural motion. Appellees did the same thing in the district court a month and a half after the case was dismissed. Also in this court, appellees have made public confidential juvenile information. Are those documents under seal in the state court, I mean, in the district court? No. None of it? No. They filed them after the judgment had been entered. When you say appellees made available confidential juvenile information, are you talking about the officers or the? I'm talking about the appellees that claim counsel. You're talking about the lawyers, by filing it in this court, in the Fifth Circuit. Is that right? And the parties held accountable is on with the lawyer. But do you have a, is there some motion that you filed with this court? Yes, we filed a motion to strike the exhibits which are promptly granted. Now, in the district court, the district court just let it sit there for months. So we struck it, and so it's no longer available on the DCN or something, right? Yes. But what I would say is that there is a pattern of unlawful secrecy. There's a pattern of privacy violations. Yet, appellees declared this till moot because they complied one time and revealed one document. Are there documents? It sounded like when you were talking that there are documents that you don't have access to. But when I read the materials, it looked like you had access to all the documents in the case. Do you or do you not have access to all the documents in the case? The documents that I have now are the maternal affairs report and then the initial discovery that was provided to me. So what do you not have? I don't have 6,300 pages of responsive documents. They've been produced, but you don't have access to seeing them? Right. Because of what order? Because of the trade secret? Because I entered a trade secret protective order which contemplates businesses and doesn't provide that the party has access to the evidence. Did you seek relief in the district court specifically to say, look, this is not workable if I'm so involved in my own case? Then he entered judgment the next day and he hasn't ruled on my motion. Thank you. Thank you. I think we have your argument. Are you going to address both arguments? Are you addressing the first argument or how is this working? Your Honor, I'd like to find out how much time do I have? I've got 90 minutes. Well, you should have I guess 15 extra minutes, didn't I? That's 35. Yes, sir. That's exactly right. And I would have noticed it in a minute that you got there before I did, so thank you. I sure appreciate it, Justice Elrod. Good seeing you again. My name is William Krueger. I have the responsibility and the privilege of representing Corporal Luna, who's in the courtroom today, Officer Trevino, who's in the courtroom today, Officer Nate Anderson, Officer Melton Robertson. In this case, this involves an event that occurred on January 14 of 2014, January 11 of 2014. It occurred at about 152 in the morning. The encounter covers about 90 minutes. The situation that is here at present is that there was an internal affairs investigation that was indeed investigated and unsubstantiated and entitled to nondisclosure, but pursuant to the arguments and just the tantrum that was presented, the document was produced, and it helped us. You're talking about the internal affairs two-page document? Yes, Justice. Okay. And the other documents. In this situation, it's cost the City of Southlake $215,000 plus for me to stand here and address this Fifth Circuit Court. Do you want to talk about the documents first? I'm going to ask you a question about the 6,000 pages. Is there some reason why the plaintiff shouldn't have access to the 6,000 pages of documents? We have given the plaintiff access to everything. We opened our files to the plaintiff, offered them, come here, mark what you want. We'll make copies of it. We said we would produce it pursuant to this trade secret situation where they can come in and look. They don't want to spend the money. They want us to. This is about money. So it's not a situation that the plaintiff herself can't look at the documents? Does the agreement in any way prohibit her or are you trying to prohibit her herself from looking at the documents? Absolutely not. Never. I find myself in a unique situation where we've won at the trial court level. We're now on the appellate level. And I'm in kind of a no-win situation because if I say something wrong, I can lose the case. So I'm looking to the court. I don't think you need to say that. That doesn't need to be said. I'll retract that thing, Justice. But I'm in a situation where we've won. If there is something that the justice courts would like to talk about, I'd like to discuss it. Otherwise, I can't go through a brief scenario if that's what the courts want to do. Your argument. It is my argument. Thank you, Your Honor. I just want to ask a couple more questions about these documents since we were talking about them. Is there, in fact, something that requires the plaintiff to destroy the documents within 60 days after the lawsuit is terminated? And is that something that you believe that you're entitled to, not you personally, but that your client is entitled to under the law such that that should be enforced? Pursuant to that order, I think that it does say that 60 days after the termination of this event that those documents should be destroyed. If there is something specific that she would want to talk about or address, I'm more than happy to take that up with her. But as we speak, they want to produce personnel files of each one of these officers with addresses and phone numbers and Social Security numbers and Texas driver's license. They want all kinds of personal information, and we don't mind them looking at it, but we don't want to have to go through it all, especially the nonessential things that have been produced and they don't care to go through. What about the filing of documents? I mean, we are an open court, and normally documents are out there for anybody in the world to see, and that's one of the ways courts are different than arbitrations, for example, and other types of proceedings. But documents that deal with minors, was that some accident that was reference made? I don't know what she's talking about, Your Honor. That there were deposition attachments that told information about minors in this court, is that not accurate? When they brought up the issue, they had identified minors in their pleadings, and when they brought up the issue, we took out minors' names if we had them in our pleadings, and we put in initials. We are not here about the minors, but this is a situation that hasn't been mentioned, is the expungement order that was addressed to the department, police department for South Lake, an expungement order that required appellees, appellants I should say, to destroy all their documents, everything that related to the case, and that we had no idea about until we produced the videos and the audios, and they said those should have all been expunged as a result of the minors' issues. If you read the expungement order, and I think you'll see some motions that I have in there addressing this, if you read the expungement order, the defense would be defenseless. There would be no defense to this case. In fact, I think the language that's very revealing is that she has to have everything redacted that calls any attention to any wrongdoings on her part and leaves only the situation with regard to the defendants, so that in looking at the redacted information, only the redacted circumstances are the actionable events. She wants those gone. Officers showing up without cause, officers being rude and speaking in disjointed sentences, and entering her home without any cause whatsoever if you go by the redaction. However, if one considers the actual record, which is what we have used in this case on appeal, the unredacted portions, there is no question that the officers were present to investigate a crime, were admitted, and best of all confirmed the presence of a controlled substance in the home, and the entry was related to that. And looking at that, if we go to Officer Nate Anderson's statement to Monty Westfall, I think it's page 10 of our briefing, Monty came outside and Officer Anderson informed him, quote, right now, we know that there are illegal drugs upstairs in the house. With your permission, and with one of the kids who knows where it is, we need to go upstairs to confiscate those drugs, okay? So whichever kid you want to take us up there to get it, it's totally up to you. Whereupon Miss Constance Westfall says, go get it. And these officers and these child and Mr. Westfall, Mr. Westfall, the child Mr. Westfall and Mr. Anderson, they start for the door. Mr. Anderson has told Miss Westfall that she is not to come. Mr. Anderson, Officer Anderson has told Miss Westfall, don't come, don't get back up on me. When I turn my back on you, don't come after me. And then Mr. Officer Anderson takes off for the door and Westfall withdraw the consent to enter the house. Did she withdraw the consent? Do we, first of all, one of the people can withdraw the consent and then nobody can go in, right? That would be right, yes, Your Honor. So is there any evidence, I mean, is there credible evidence that she withdrew the consent for them to go in the house, that she wasn't going to be allowed to go in the house? No, I think Justice King hit on that when she says, go get it. That's not going to happen in a vacuum. Okay, so after that, though? After that, they all start in. No, but at that point when she says, I'm going to, there's a commotion. There is a commotion. We take that commotion to be withdrawing the consent. Can you read the, listen to the commotion on the tape and say that that was her withdrawing the consent? No, she doesn't say, stop, don't go in there, I don't want you to go in there. Okay. She says, I'm entitled to go in there, I want to go in there. Mr. Westphal asked for a drug dog to sniff around and see what exactly is going on. I think here that's lost in these constitutional arguments is children that are taking drugs that the parents don't know what they are. We have put these officers in a catch-22 situation, and we're not looking at the children that are not being supervised and that are taking drugs. And going into other people's houses when they're not allowed to. That is the root of this case. The police are called to do the jobs that we don't want to do, and they show up when the dysfunction is at its peak. It is unfair now to say that the officer is not smart enough, not bright enough, not trained well enough, or equipped well enough to be able to understand all the intricacies of the law and the psychologies of these minors and these adults, as well as any medical situation. Counsel, I hope that you don't take any questions of the court to be saying that officers are not intelligent or any of those other things that you looked at. We're just trying to answer the questions about the case and the constitutional issues that are before us. The other questions are bigger than this court. So, is it your position that it was appropriate to go to the door in the middle of the night? Is that the legal position of your client to go, or do you have a view about Florida v. Jardines and whether you're allowed to go to the door in the middle of the night? I have a considerable view about Florida v. Jardines, and I think we've spent about three days in our response. A little bit confused by the way the appellant's counsel has looked into Florida v. Jardines and the statements that they construe from that. So often, in their analysis, they do not read the entire case. They do not apply the entire case so that it gives its true meaning. But in Florida v. Jardines, we believe that the plaintiff's counsel has misconstrued that case. Let me pull up my portions of that for the court to see. We believe that the appellant takes a quote out of context and asks the court to hold that an officer must, upon approach to a home, not politely, and then if not answered, leave. Absent any invitation, the officer can't stand in the yard or look around the front yard. That's really not what happened here. In this particular situation, the call comes in. Trevino, Anderson are dispatched. I think Trevino goes to the Ortiz home. King Ortiz is a runaway. He's reported as a runaway after this event. His room is locked. They can't get into his room. The occupants, the sister and the boyfriend, say that they came in without knocking, and they're in our house, and they were upset, woke the mom, the mom and the sister and the daughter, called the police. They say that the suspects, two males with the Indian-colored T-shirt and all kinds of things, that identifying characteristics, have left the Ortiz home. Sorry. There was an Indian on one of the T-shirts. You said Indian-colored. I think the testimony was of an Indian chief on the T-shirt. That's it. Right? That's it. All right. Go ahead. They go to that home. They see the boys upstairs walking around. They're looking out the window. They know the police are there. Everyone knows the police are there except Ms. Westall, evidently, pursuant to her testimony. Although she knows enough to come to the door, the police say, we need to see your son who's criminally trespassing. She shuts it and goes looking for her glasses, no telling what. Well, wait, okay. I've got a question, though. Yes, ma'am. Is this a knock and talk, or is this some sort of arrest that's taking place? What is happening? Because if it's just a knock and talk, she could shut the door and never open it again. And she doesn't have to. Isn't that right? Well, now, with the knock and talk, she can shut the door. And she doesn't have to let them in at all until they show back up with their warrant. Okay. Isn't that right? They call. Yes. So assume that that's right. They call. The first call, Mr. Westall answers and hangs up, thinking it's a crank call. They call. Knock again. Then the children answer the second call, third call, and that's when they come down. So I guess the question is, the second loud knocking, is it your position that that was appropriate under the constitutional law, or is it your position that, well, that's not appropriate, reasonable, it's not clearly established, or some other? What is your position as to the second pounding on the door? Because assuming the argument is that you can do a knock and talk at 2 a.m. We'll spot that. Then when she shuts the door, even if she intends to come back, whether or not she does, can they pound on the door after that legally? Just as straight as I may have been spoke. You've got me saying that this is a knock and talk, Mr. Selrod? This is a situation where when we knock, we've already seen the suspects or what we think is the suspects or what could be the suspects in the home. They're not going on anymore because you can see them in the home. So the trespass is a completed offense. There's no ongoing offense at that point because you said the officers can see them in the home. So under what authority do they approach the door the first time and then the second time? I think under the same authority in that they have reasonable suspicion and cause to go and knock on the door and find out what is going on and if they're harboring suspects in that home. Suspects of what? Of the trespassing? Of the criminal trespass. Yes, ma'am. I guess that's kind of what I ... Let me be careful how I word this. But it sounds to me like this is an ongoing criminal investigation. They got a report of a crime. The person who makes the report says the trespasser went next door. And so they go next door in pursuit of the trespass. It's an ongoing criminal investigation, isn't it? And so the question in that connection just is how far can they go in terms of investigating? They got a report of a crime. Now, maybe we're sitting here saying, but they knew it was a 15-year-old boy and they knew he was going to the neighbor's house. I don't know what they knew at the moment. But I know there was a report of a crime and the officers are investigating that crime, aren't they? Yes, sir. All right. So the question is then how far can they go in pursuit of that investigation without violating the Constitution? Anything that's subjectively reasonable. So they knock on the door, they get a response, they get the children down, they can talk to the children. But before that, can they knock a second time loudly? What gives them that permission? Nothing has been said to them that stops them from doing that. Everything that they know at this point is... Doesn't our case say if you shut the door that you can't pound on the door and pound on the windows? Don't we have cases that hold that? I think, Your Honor, that we're mixing those cases with this ongoing investigation. We see the suspects and we're trying to talk to these suspects. We don't know what's going on. It might be a minor 15-year-old criminally trespassing. It might be something more serious. Or it could be a house burglar going from house to house seeking to look for somebody to rob, couldn't it? Mass murder or anything, Your Honor. Okay. So you don't... You believe that it's okay to pound on the doors? So that's... So in answer to Judge Graves' question, it's okay to keep pounding on the door until the people answer? I think it's okay to objectively and reasonably knock on that door. Is it okay to go on the curtilage of the house and shine lights in the house? I think if you see movement in the house, it might be okay to go and see and to address that as well. What gives the officer the right to go on the curtilage of the house at that point? Now, Your Honor, if you would please define for me the curtilage of the home because I don't know about them going behind the house. This is the backyard. I don't have any evidence or indication that they... Well, it's in the... I don't know if it's true or not, but it's in the pleadings. Everything is pretty much body-cammed in audio, so if it's not in the video or the audio, I'd have a serious concern over it. How did Mrs. Westfall wind up on the brick walk? On the... At the entrance of the door, there's some dispute about actually where she did wind up. She wound up on the brick, apparently, and she was injured. Now, how did that happen? She attempted to go into the door. She attempted to follow Officer Anderson. And someone of the police said, it's her home, you know, which, you know, it was. So she went and tried to go back in the home. And apparently, the police then said, no, no, you can't do that. And she winds up being thrown onto the brick pavement. Now, how did that happen? What's your version of that? She approached Officer Anderson from behind and rapidly, and she shouldn't have done that after being warned many times not to. So he was protecting himself or from her? Or Officer Luna was protecting Officer Anderson when Mrs. Westfall, in noncompliance, in opposition to the orders that were given, at a critical time, approached Officer Anderson from behind rapidly after the officer had warned her, don't come up behind me. Now, Anderson is the one who was going into the house and upstairs to get the drugs, right? That was him? Yes, Justice Ginsburg. I'm not sure about the names. But he was the one that was going to go with the son and possibly the husband upstairs to get the drugs. He went with the son and with the husband, and he had a dog provided at the husband's request. A dog? A canine drug dog. Because at that point, you have children that are ingested drugs, that are unsupervised, and you don't know what is going on there. The dog was already there at that time? I think they had one of the other officers had brought a dog. That's why we have so many officers there. And they showed up, they showed up with a drug dog because they heard something was going on about drugs or whatever. No. No? No. What? Help, help me. Another officer is showing up. Yeah, when the next officer shows up, he usually shows up with a drug dog. Yes, Your Honor. That's it. Yeah. Okay. But they didn't initially show up with a drug dog. Not initially. They were going to somebody's house. So who was it that threw her on the ground? Corporal Luna. Luna, okay. Is it your position that she could not have gone back in her house at that time? It's my position that she should not have gone behind Officer Anderson in a threatening manner. That's my position. It is her home that she can return to. So she could have returned to her home. She shouldn't have been blocked from it. At some point, she could return to her home unless she's interfering with an investigation or there's reasonable suspicion that she would be interfering with an investigation. There is case law where they say, I know there's drugs in there. It's been reported that there's drugs in there. We are going to wait out here for a warrant or you're going to say it's okay to go in. So they went in. The husband, the son, and Anderson went in. I can understand everything right up to that point. I cannot understand how she got thrown to the ground on that brick patio. I can't understand that. That's very difficult. When Anderson's going in, she is chasing him. Okay, and I guess that's where my problem is because up to that point, I see an ongoing criminal investigation. I got a report that somebody was in. Somebody showed up in my house in the middle of the night and I reported that I want the police to try to find out who that person was. And if I said they went next door, I expect them to go next door and look for them. Here's my problem, though. Apparently, Ms. Westfall is on the brick, which is outside. Is that right? There's a patio that's outside in the front and there's a step that's brick and right in front of the house, say four by eight or something like that. Let me see if I can get some agreement. You agree that at some point she ended up on the ground. You agree with that? All right. You agree that she was outside the house at that time? She was outside the house attempting to go in. Okay. So tell me how it is that Anderson was inside the house already when this happened, but she was approaching Anderson at a fast pace. Wasn't he inside the house when all this happened? He was going into the house. He was going in. Pursuing him. Yes, Your Honor. All right. There is a disagreement among the parties that Officer Anderson was already in the house and the door was closed when she comes and tries to get in at that later point. We think it's more contemporaneous. Judge Reed O'Connor thinks it's more contemporaneous. The audio of this event shows it to be much more contemporaneous than portrayed by felons. Why is it that the police, she invited them into the house and they said they wouldn't go? Am I missing the significance of that? Why did they say they wouldn't go? I'm trying to remember. I think she invites the police into the home on two separate occasions prior to the children coming out. I don't exactly recall what the subjective reasons were. I don't think it's objectively unreasonable to remain outside while trying to review what is going on. Consequently, I don't know as well, Justice King, I don't know why they did not go into the house at that time. I don't know if this has any constitutional significance or not, but it's puzzling to me. When I listen to the tape, the officer is telling her to be quiet. When she's telling her child, don't you see why you shouldn't be doing this and he's not even home and his parents have control of the house. She's giving him the kind of lecture that you, I would think, would be in favor of given your earlier comments and your argument today. They're telling her to be quiet even though the other officer is giving the son kind of the same lecture except at a heightened level because once he gets to where the mother is in the difficult spot on the ground, he's saying, do you see you caused that and that's your fault because you're doing this, which I don't know that that's... So why is she being told to shut up when she's talking to her child about why he shouldn't be doing this? It seemed like that was a parental normal thing and they're not in an official some sort of interrogation that, in fact, they couldn't really even talk to the kids without the parents there anyway. So what's going on with that and does that have any constitutional significance? Well, Justice Elrod, I think we disagree with the sequence of when that happens. My listening to the audio shows that she is coming on the scene and asking the officers questions and disrupting the investigation. Officer Luna at the outset says, Ms. Westphal, step over here and let me bring you up to speed. Did the same thing with Mr. Westphal as well. Step over here, let me tell you what's going on. She refuses. She continues on. Nate Anderson has stopped talking to her because of these kinds of activities. Not the helpful motherly comments, parental comments that you're talking about, the interfering, distracting comments that I'm talking about. Trevino has stopped the conversation as well. Luna, a supervising officer, Corporal Luna comes on and says, step over here, let's talk. Step over here, let me bring you up to speed. Let me tell you what's going on. She refuses that. She continues on and he says, I need you to be quiet. You can't stand here and interfere with the conversations that are going on or you need to go inside. She refuses that as well. Can you interfere with the conversations going on? I'm not talking about it as a practical matter, whether it's a good idea. Should we all comply with the police and isn't that good? But she could say, you can't talk to my minor child at all. At any time. Well, I don't think that's a probable cause to arrest your minor child. And then she could say, and you need to be quiet little child here or big child there. And she can talk to her minor child until she starts to interfere with the investigation. But she has a right to be right next to him during the whole thing, doesn't she? As long as she obeys the law, she does. But they can't talk to him anymore if she's not standing there, can they? I think they can. They can interview a minor without the parent being there? I think they can. Is that tax law that says that or constitutional law or what law says that? Constitutionally, they can. If it's objectively reasonable, I think they can talk to the minor. Now, if the minor asks for a lawyer, if the parent asks for a lawyer for the minor, I think that's different. I think the parent's entitled to be there. But during the investigation, the criminal investigation, they're trying to figure out if there is a crime going on and if there's any more danger. So I think they can talk to the minor in those circumstances. I think they should talk to the minor, especially if it's objectively reasonable. And to finish up with the conversation, Officer Luna says, you know, you could go inside. She doesn't want to do that. And then he says, I can't talk to you anymore. So what we have is a breakdown in those communications so that when she does go running, pursuing Nate Anderson, it is a serious problem. And the officers, objectively, reasonably, can respond to that. I've seen Briggs v. Brewer, and I agree with Justice Graves, and I've seen the cases that you've ruled on too. In some of these situations where function has become dysfunction, law enforcement is here to bring things back to a peaceful conclusion. Ms. Westphal was put on the ground, but was put on the ground in a delicate way in which the law enforcement officers apply their trade. She could have been seriously injured. She was not. She could have had ligaments torn. They were not. Tensions, ruptures. Did the officers think she was going to bust her head open? She didn't, did she? None of the officers was concerned about that. They're all concerned, and that's why it didn't happen. So what about the time that she spent in the car before she went to the medical treatment? Less than an hour before the time that she got arrested until the time she was in the hospital. I think they called at 235, and the paramedics are there at 305. I'm looking at this and saying in less than 30 minutes. She gets in the car at 235. I think they make the call at 305 and the paramedics show at 315. That operation was done and conducted in a managed scenario so that the injuries were de minimis to minimal. It was painful. It was humiliating. We don't want to repeat it on a lot of levels. But with that said, that's where this thing ended. I practiced before this court for 30 years. I am very humbled to be here, and I'm very appreciative of the responsibility and the privilege of working with law enforcement officers and having clients whose motto is to protect and serve. In my research in this case today, something I think is interesting and very telling, I found a saying that said some people are very concerned about law and order, and other people are very concerned about justice. The reality is that these people will have neither until they have both. Yours is the job to make sure that law and order and justice is provided. We probably know that. I think you should know that. Thank you, Justices. Thank you. I think we have your argument. Thank you. Thank you. If y'all can give a rebuttal. I'd like to respond to a few things that Apali said in their argument. But before I do that, the first thing I want to do is clear up something I said about the record that I think was inaccurate. When asked about whether or not the consent was expressly withdrawn before they entered her house, I said it had to be implied. It was not expressly withdrawn. I was mistaken about the record. It was expressly withdrawn. This is an issue, actually, that's not disputed between us. So I'm going to read from Apali's brief, page 11, where they're talking about when Officer Anderson is going into the house. They say that Plaintiff continued to protest, saying, let me go, I don't want you people to go up there. So I think it's unconfessed that she did, in fact, expressly withdraw any consent to enter the house as Officer Anderson was entering. I'm sorry, I misrecalled the record on that. The next thing I want to talk about is the first thing that Apali's mentioned was the IA investigation. I'd just like to point out that that is not in the summary judgment record. It was not admitted by the district court. The district court did not admit a single piece of evidence that the Apalis put forward except the audio tapes. That was the only evidence that the district court admitted from them. I'd also like to clarify it was represented that Mrs. Westphal said, go get it, and then they entered the house. What Mrs. Westphal said was her son's name, comma, go get it, not just go get it. So it's clear who she's directing that statement to at the time she makes it. I'd like to respond to the question that police officers are called when dysfunction is at its peak. There's also case law, including Williams v. Kaufman by this court, where this court has recognized that when police create dysfunction, when police create chaos, they can't then use that chaos to justify further violations of constitutional rights, and I would posit that that's the kind of scenario we have here. I'd like to point out that Apalis Counselor mentioned that the officers called the house several times, and that's when the teenage boys came to the door. They came to the door because they were instructed on the phone to go to the door, and then when they went to the door, they were instructed by the police to come outside. So this was not a voluntary act on their part. With respect to the ongoing investigation issue, I'd like to point out a few things. An ongoing investigation gives the police some authority to act, but I think when it comes into conflict, when the actions they want to take to continue the investigation comes into conflict with the private citizen's rights, that's where the authority ends, unless there's something that further justifies violating the court, further justifies an imposition onto the constitutional rights of the private citizen, such as exigent circumstances. Again, there were no exigent circumstances here. The boys weren't fleeing arrest. But were they investigating an ongoing crime? They may have been. Well, they weren't an ongoing crime, no. It was a crime that had terminated at the time the call to 911 was made, but they were investigating a crime that had been reported, and they're free to do that up until the point that their investigation comes head-to-head with a private citizen's constitutional rights, and at that point we get into a body of law about when they have the right to interfere with the private citizen's constitutional rights. There are circumstances that will justify what would otherwise be a violation of a constitutional right, like exigent circumstances, but those circumstances weren't present here. And I'd also like to point out one common justice phrase that you made was about if someone came to your house in the middle of the night, you would want the police to find out who it was that did that, and on this record I'd just like to point out that the caller identified the people who came to her house by name in the 911 record, and again when Officer Trevino showed up, so they did know who the people were who had come to the house. I'd also like to point out that the record does demonstrate at least to some degree what the officers knew at the time of arrival on the scene, because there are the police records of what is said over the police radio, so they do know things like these are two teenage boys, and they left the house and they were told to leave, and things like that are known to the officers when they arrive on the scene. They can be heard talking on the radio, and they can be heard receiving these communications. With respect to the invasion to the cartilage of the house, that is reflected on the audio records. You can hear the gate creak. You can hear them looking in windows, knocking on windows, talking about looking through windows in the backyard. I don't know that every detail of it is in the audio records, but certainly it's consistent with the audio records if those are admissible. With respect to Mrs. Westphal moving in a threatening manner, I see that my time is up. Thank you for your time. Thank you, Counsel. We have your argument. Case is submitted. Court will stand in recess until tomorrow. Thank you.